IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

|  |  |  |
|---|---|---|
| KRISTEN SHIVELY, | ) | Case No. 4:10-cv-00053 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | **MEMORANDUM OPINION** |
|  | ) |  |
| HENRY COUNTY, VIRGINIA, and | ) | By: Jackson L. Kiser |
| HENRY COUNTY 9-1-1 | ) | Senior United States District Judge |
| COMMUNICATIONS CENTER, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

Before me is Defendants' Motion for Summary Judgment, which was filed with the Court on July 25, 2011 [ECF No. 19], as well as Defendants' Motion to Quash Deposition [ECF No. 24]. Plaintiff requested an extension to file her response to the Motion for Summary Judgment, and I granted Plaintiff until noon on August 15, 2011, to respond. [ECF No. 23.] Although her response was not timely, Plaintiff filed a Memorandum in Opposition on the appointed date. [ECF No. 27.] Plaintiff filed her response to the Motion to Quash on August 17, 2011. [ECF No. 29.] On August 19, 2011, I heard oral argument from both sides outlining their respective positions on the law, the facts, and the nature and extent of the record. Having thoroughly reviewed the briefs, the record, and the arguments of counsel, the matter is now ripe for decision. For the reasons stated in open court, I will **GRANT** the Motion to Quash the Deposition of Rebecca Wells. For the reasons stated below, I will **GRANT** the Motion for Summary Judgment as to both Defendants on all counts.

# I.    STATEMENT OF FACTS

Plaintiff Kristen Shively was hired by Defendant City of Martinsville/Henry County 9-1-1 Communications Center ("Call Center") on May 6, 2008; she began working on June 2, 2008. As a new hire, Plaintiff was placed on probationary status, meaning that her work was routinely overseen and reviewed by management.  (All new hires are placed on this probationary status despite performing adequately on aptitude tests administered during the interview and hiring process.)  According to Plaintiff, she performed "exceptionally" on these aptitude tests; during his deposition, Plaintiff's supervisor admitted that her performance on her initial aptitude tests was adequate.  (Wesley Ashley Dep. 26:13-16, July 11, 2011.)

On June 28, 2008, during the early stages of her employment, Plaintiff encountered several of her co-workers discussing dyslexia and making allegedly disparaging comments about those who suffer from that limitation.  (Kristen Shively Dep. 21:4-8, July 11, 2011.)  Plaintiff's immediate supervisor, Margaret Bruce, was present during the discussion.  (Id. at 21:24.)  Upon hearing the allegedly disparaging remarks, Plaintiff objected and advised her co-workers that, during childhood, she was considered to have a learning disability.  (Id. at 21:4-8.)  She also advised her co-workers to refrain from further comments of the same nature because she found them offensive.  (Id.)  Pursuant to the Call Center's harassment policy, Plaintiff informed her supervisor (presumably Bruce) that she found the comments offensive; Plaintiff asserts that Bruce "did nothing concerning the offensive remarks."  (Compl. ¶ 19.)  Plaintiff maintains that, from this point on, her employer perceived her as being disabled.  (Id. ¶ 19.)  Plaintiff also claims that Bruce informed the Call Center's director, Wes Ashley, that Plaintiff was a "self-proclaimed dyslexic."  (Id. ¶ 20.)

- 2 -

Plaintiff asserts that, following the aforementioned incident with her co-workers, Defendants "began a campaign of harassment and denigration designed to force the Plaintiff to resign and/or create a basis for Plaintiff's termination." (Id. ¶ 21.) Plaintiff asserts that she was reviewed and scrutinized more heavily than other probationary trainees. (Compl. ¶ 21.) She was allegedly required to produce documentation concerning her dyslexia and asked to provide a note from her doctor saying that she could perform the job of a dispatcher. (Id.) In addition, her supervisors performed independent research on dyslexia to determine if Plaintiff could perform the job. (Id.) Despite researching the limitations of dyslexics, Plaintiff's supervisors never afforded her the opportunity to prove her abilities, denied her the opportunity to attend dispatcher school where she could have been certified (thereby proving her ability), and terminated her employment because of a gross misperception of her limitations. (See id. ¶ 23-28.) Although she made several documented errors during her employment, Plaintiff contends that she identified and corrected them all herself (See, e.g., Def. Ans. to Interrogatories No. 11 [Pl. Dep. Ex. N]; Shively Dep. 33:3-5; Margaret Bruce Dep. 42:3-15, July 11, 2011 [noting Plaintiff made a transposition error while dispatching solo, but corrected it after reviewing the instant retrieval tape system].) Additionally, she claims that none of her "mistakes" were of the "life-threatening" type that Defendants claimed to fear and that would have justified her termination.

Furthermore, Plaintiff avers that Defendants observed and documented her mistakes solely because they thought she was dyslexic and, therefore, more prone to making such mistakes. In support, she cites her review by Maria Lemons. While trying to determine whether Plaintiff was qualified and able to perform the job of dispatcher in spite of her dyslexia, the Call Center's director, Wes Ashley, asked Lemons, a dispatch school instructor who he believed was unaware of Plaintiff's dyslexia, to monitor her work. (See Ashley Dep. 48: 8-10.) Plaintiff

asserts that, during those six hours of review, no mistakes were noted. (See id. But see Dep. Ex. Lemons 1.) When Margaret Bruce monitored her, however, Plaintiff contends Bruce saw and recorded errors that would otherwise have been of little significance but for Bruce's belief that Plaintiff's dyslexia was the cause. (Cf. Bruce Dep. 50:14-18.)

Defendants counter that Plaintiff was subjected to the same scrutiny and review as all new hires on probation. Moreover, any additional scrutiny was justified as they attempted to determine the level and extent of her dyslexia, as well as the effect her alleged dyslexia would have on her job performance. While Plaintiff maintains that she was subjected to hyper-intensive scrutiny and that her employers demanded that she produce documentation of her disability, as well as requiring her to retrieve school records from her days in special education classes in elementary school, Defendants assert that her review was customary and that her ultimate termination on September 23, 2008, was solely because of her job performance. For example, Bruce documented Plaintiff transposing street numbers in addresses (see, e.g., Pl. Dep. Ex. D pg. 11), misunderstanding and therefore erroneously transcribing street names, and having difficulty grasping the idea of a car traveling eastbound in a westbound lane. (Pl. Dep. Ex. G.)

Following Plaintiff's disclosure of her dyslexia, her supervisors began researching the disorder. Defendants claim it was out of an abundance of caution due to the nature of the work performed at the call center and their concerns over potential liability should Plaintiff's dyslexia cause her to make an error which resulted in injury or death to a caller or officer (Ashley Dep. 40:5-22);[1] Plaintiff claims it was a concerted plan of action designed to culminate in either her resignation or a fabricated rationale for her termination. Supervisors took it upon themselves to

---

[1] Although the parties do not brief the nature of the Call Center's fears, it is reasonable to conclude from Wes Ashley's testimony that potential dangers that could arise may include: sending an ambulance to an incorrect house or street; failing to discover a warrant on a potentially violent offender for an officer about to engage the individual; or sending police to the wrong address during an armed robbery.

- 4 -

contact HR representatives and education specialists to determine whether it was safe to have a dyslexic serve as a 9-1-1 dispatcher. (Id. 43:24-44:3.) In their copious notes reflecting various conversations about Plaintiff, the supervisors assert that Donna Yerby, an educational director in Chapel Hill, North Carolina, allegedly advised them that "it only takes one time to get it wrong" and recommended that they tell her she is "not a good fit" and let her go. (See Summary of Conversations pg. 10-11.)

During Plaintiff's review process, Margaret Bruce, the supervisor assigned to train Plaintiff, allegedly stated that she has never worked with a trainee who made so many mistakes. (See Ashley Dep. 43:8-11, 45:12-14; Bruce Dep. 57:7-18.) As a result of these repeated errors, Defendants claim, Plaintiff was terminated three months after she started working for making "too many errors." (Ashley Dep. 43:8-9.)

## II.    PROCEDURAL BACKGROUND

Plaintiff initially filed suit under the Rehabilitation Act in April 2009. Her suit was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Then, on October 26, 2010, she filed the present action, asserting discrimination and retaliatory discharge under the Americans with Disabilities Act ("ADA"). Following discovery, Defendants moved for summary judgment on all counts. Despite being granted an extension to file her response, Plaintiff filed a late response on August 15, 2011.[2] As a result of the extension I granted, Defendants were unable to file a reply.

---

[2] Generally speaking, filing a pleading over four hours late—as Plaintiff's counsel did in this case—would not provoke the ire of the Court. This, however, is an exceptional circumstance. Not only was Plaintiff's counsel granted an extension to file his client's response, but the extension only afforded me three days to review the record adduced prior to the scheduled oral arguments. Again, while that length of time may be appropriate in some instances, the Defendants' Memorandum and supporting evidence totaled 251 pages, while Plaintiff's late Memorandum in Opposition was 37 pages, single-spaced, in 10-point font, and was accompanied by 231 pages of deposition transcripts and exhibits (including condensed deposition transcripts, which include four pages of transcript on every page.) Plaintiff's counsel is reminded that it is his responsibility to read and comply with all Orders that I issue, giving special consideration to the deadlines for filing responses to motions for summary

- 5 -

## III.     STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c).  The court must view the facts and the inferences to be drawn from them in the light most favorable to the party opposing the motion.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The moving party has the initial burden of pointing out to the court the deficiency in the non-movant's case that would make it impossible for a reasonable fact-finder to return a verdict in the non-movant's favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A movant-defendant may show that he is entitled to judgment as a matter of law by demonstrating that the non-movant plaintiff could not prove an essential element of his case.  Id. at 322-23.  It is then up to the non-movant to demonstrate to the court that there are genuine issues of material fact and that he has made a sufficient showing on each of the essential elements of his case.  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008); Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).  Therefore, summary judgment is appropriate when the moving party points out a *lack* of evidence to support an essential element of his or her claim.  See Blair v. Collonas Shipyards Inc., 52 F. Supp. 2d 687, 692 (E.D.Va. 1999), aff'd 203 F.3d 819 (4th Cir. 2000).

---

judgment.  As he was advised at the start of the case, his failure to file a timely response could have lead to the motion being well-taken.  (See Pretrial Order ¶ 4 [ECF No. 11].)  Although I reach my decision solely on the merits, Plaintiff's counsel would be wise to avoid missing express filing deadlines in my court—or any other court—in the future.  He escapes sanction only because Defendants' counsel has not asserted any prejudice as the result of his late response.

# IV.    DISCUSSION

This case, like its predecessor under the Rehabilitation Act, is a perception case.   In essence, Plaintiff does not claim that her dyslexia is a disabling condition; rather, she contends that her employer erroneously *thought* that it was.   This alleged perception—if shown—brings Plaintiff under the protection of the ADA.   See 42 U.S.C. § 12102(2) (2008) (defining the term "disability" as "being regarded as having" an impairment that "substantially limits one or more of the major life activities" of an individual).   During Plaintiff's employment, the state of the law required that an employer perceive an individual as suffering from a disability *that substantially limits one or more of the employee's major life activities* in order to bring that individual within the protection of the ADA.   See Murphy v. United Parcel Serv., 527 U.S. 516, 521-22 (1999) ("[A] person is 'regarded as' disabled . . . if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."). On January 1, 2009, the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), P.L. 110-325 (2008), took effect and altered the requirements of a perception case.   Now, to be "regarded as having such an impairment," an individual need only "establish[] that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C. § 12102(3)(a) (2010).   Because Plaintiff's employment commenced and was terminated before the applicable date of the ADAAA, and because the ADAAA is not to be applied retroactively, the prior law governs.   See Cochran v. Holder, No. 10-1548, 2011 WL 2451724, at *4 (4th Cir. June 21, 2011).

- 7 -

A. <u>Plaintiff's Claim of Discriminatory Termination in Violation of the ADA Fails Because There Is No Evidence That Plaintiff's Employer Viewed Her As Substantially Limited in One or More Major Life Activities</u>

Plaintiff has asserted two causes of action under the ADA.  First, she alleges that she was discriminated against on the basis of her *perceived* disability when she was terminated.  To succeed on her claim for discriminatory termination under the ADA, Plaintiff must prove that: (1) she was disabled as defined in the ADA; (2) she was a "qualified individual" for the employment in question; and (3) her employer discharged her or took other adverse employment action against her because of her disability.  See <u>E.E.O.C. v. Stowe-Pharr Mills, Inc.</u>, 216 F.3d 373, 377 (4th Cir. 2000).  The ADA provides that a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (2008).

In a perception case, it is not enough that a plaintiff's employer merely view him or her as disabled; the employer must view him or her as disabled within the meaning of the ADA, to wit, "substantially limited in one or more major life activities."  See <u>Davis v. Univ. of N. Carolina</u>, 263 F.3d 95, 99-100 (4th Cir. 2001).[3]  In their Motion for Summary Judgment, Defendants assert that there is simply no evidence on which Plaintiff can carry her burden to show that her supervisors at the 9-1-1 Call Center viewed her as substantially limited in the major life activities of speaking, learning, performing manual tasks, hearing, and seeing.  (See Compl. Count I ¶ 3.)  They contend that the evidence only established that they viewed her as unable to perform the job of a 9-1-1 dispatcher.  It is well settled that one is not substantially limited in the major life activity of working if she is only viewed as unable to perform one job or a small subset of jobs.  See 29 C.F.R. § 1630.2(j)(3)(i) (2010) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").

---

[3] Although the ADAAA vitiates this rule, the change was not in effect at any point during Plaintiff's employment.

Defendants argue that the testimony of Wes Ashley and Margaret Bruce, Plaintiff's supervisors, "reveals only that they observed errors being committed by Shively, some involving the transposition of numbers and letters, and that they did not recommend her for full-time permanent employment because of those errors." (Def. Br. pg. 6.)

Plaintiff counters that the evidence is replete with references to Plaintiff's supervisors viewing her as having difficulty processing information, understanding spoken directives, and relaying information appropriately. Wes Ashley, director of the Call Center, testified that he was concerned about her transposing numbers and letters "as far as speaking goes." Betsy Reynolds, another supervisor at the Call Center who was aware of Plaintiff's dyslexia, thought "she had trouble processing the information that she had" despite the fact that she considered Plaintiff to be an "intelligent young lady." (Betsy Reynolds Dep. 53:1-3, April 6, 2011.) In performing their independent research, Reynolds highlighted the passage: "[S]ome people with dyslexia are easily distracted, finding it difficult to focus on one task at a time. Others have difficulty simultaneously processing auditory and visual information. There are obvious implications for a dyslexic worker seeking a career where such processing is integral to the post, such as an air traffic controller." (Pl. Br. in Opp. Ex. F.) What is lacking, however, is any evidence that Plaintiff's supervisors ascribed to this view, or felt that Plaintiff was so limited.

Plaintiff's position is too simplistic and too narrow. Plaintiff's argument, in essence, is that because her supervisors thought she might have problems with various components of the dispatcher job—i.e., relaying certain numeric information orally—then I should extrapolate from that and determine that they viewed her as substantially limited in analogous major life activities—i.e., speaking. This I cannot do without overflowing the banks of reason. [4] Simply

---

[4] If I were to hold as Plaintiff would like, I would necessarily abrogate the requirement that an employer "regard" an employee as substantially limited in a major life activity, as most jobs are made up of various component skills that,

- 9 -

Case 4:10-cv-00053-JLK   Document 32   Filed 08/29/11   Page 9 of 15   Pageid#: 902

because Wes Ashley said Plaintiff's dyslexia may cause her to have problems when she relays information orally does not compel the conclusion that he viewed her as substantially limited in the major life activity of speaking. (See Wes Ashley Dep. 69:5-13.) Simply because Plaintiff's dyslexia may cause her to process information more slowly than others does not mean Wes Ashley believed Plaintiff to be limited in the major life activity of learning. In fact, Plaintiff was viewed almost universally as an "intelligent" individual who simply was not able to perform certain vital aspects of *this* job. (See Pl. Dep. Ex. O.) There is no evidence that her supervisors viewed her as "substantially limited" in any major life activity—they only thought she would have difficulty performing certain facets of the job of a 9-1-1 dispatcher, and that those risks were too great in the context of emergency services. In the absence of any evidence to Plaintiff's employer perceived her as substantially limited with regard to one or more major life activities, summary judgment is appropriate. See Stumbo v. Dyncorp Tech. Servs., Inc., 130 F. Supp. 2d 771, 774 (W.D.Va. 2001), aff'd 17 Fed. App'x 202 (4th Cir. 2001).

B. Plaintiff's Retaliation Claim Must Fail Because It Was Not Objectively Reasonable for Her to Believe that She was Engaging in a Protected Activity

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) that she engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. Williams v. Brunswick Co. Bd. Of Ed., No. 10-1884, 2011 WL 2938073, at *1 (4th Cir. July 22, 2011) (citing Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002)). In addition, one who claims retaliation following a

---

when expanded to their extreme, constitute a major life activity. Admittedly, Congress' actions in the ADAAA do abrogate that requirement, and under the *new* "perception" standards set out in the ADAAA, Plaintiff's discriminatory termination claim would survive summary judgment. But I am duty-bound to enforce the law as it exists. Congress and the courts have made it clear that the ADAAA is not retroactive, and the law at the time Plaintiff was employed will not permit her claim to go forward.

complaint must establish, at a minimum, that she had a good-faith belief that the opposed conduct violated the ADA.  Mason v. Wyeth, Inc., 183 Fed. App'x 353, 363 (4th Cir. 2006); see Freilich, 313 F.3d at 216 ("A plaintiff need not establish that the conduct she opposed actually constituted an ADA violation.  But a complainant must allege the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA.").  The reasonableness of the belief is a question for objective review:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that this belief was *objectively* reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

Roberts v. Rayonier, Inc., 135 Fed. App'x 351, 357 (11th Cir. 2005) (unpublished); see also Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir. 2002) (applying this Title VII, "reasonable-belief" framework in the ADA context); Fox v. Gen. Motors, 247 F.3d 169, 176 (4th Cir. 2001) (noting that "courts have routinely used Title VII precedent in ADA cases."). Therefore, without regard to whether Plaintiff was *actually* complaining about an ADA violation when she approached her supervisor about her co-workers' comments regarding dyslexia, if it was not objectively reasonable to believe that she was complaining about an ADA violation, summary judgment is appropriate.  Cf. Jordan v. Alternative Res. Corp., 458 F.3d 332, 341 (4th Cir. 2006) (concluding that, under Title VII, no objectively reasonable person could have believed that the plaintiff's complaint about a co-worker's one-time use of a vulgar, racist term in regard to an African-American suspect on the news was a complaint about a hostile work environment, and affirming dismissal under Fed. R. Civ. P. 12(b)(6)).

Although the Fourth Circuit does not appear to have addressed the objective reasonableness inquiry in the ADA context, it has addressed it under Title VII. See Jordan v. Alternative Res. Corp., 458 F.3d 332, 339-40 (4th Cir. 2006). "Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment"—I find the Title VII "objectively reasonable belief" analysis to be persuasive. Fox v. Gen. Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001); see also Roberts v. Rayonier, Inc., 135 Fed. App'x 351, 357 (11th Cir. 2005) (employing the "objectively reasonable" test in the ADA context); Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311-12 (11th Cir. 2002) (same).

In their motion, Defendants argue that Plaintiff was not engaged in a protected activity. Under the ADA, "no person shall discriminate against any individual because such individual opposed any act or practice made unlawful by this Act . . . ." 42 U.S.C. § 12203(a) (2010). In the present case, Plaintiff contends that her complaint[5] regarding her co-workers' statements about individuals with dyslexia was a "protected activity." Defendants argue that Shively's inability to enunciate the nature of the comments or to produce evidence that she ever complained is fatal to her claim. Because it was not reasonable for Plaintiff to believe that she was opposing an unlawful employment practice when she complained to Margaret Bruce about the comments, summary judgment is warranted.

In Jordan v. Alternative Resources Corp., the Fourth Circuit addressed whether the plaintiff could have objectively believed he was opposing an unlawful employment practice under Title VII when he complained about a co-worker's comments. The Court noted that if the

---

[5] At oral argument, the parties disagreed over whether Plaintiff actually complained to her supervisor, or whether Margaret Bruce was merely present when Plaintiff castigated her co-workers. This is not material because, if Plaintiff never complained, she never engaged in a protected activity. Even if she did complain, it was not objectively reasonable for her to believe that she was opposing an unlawful employment practice. Under either factual scenario, Defendants are entitled to summary judgment.

employee subjectively believed he was complaining about an unlawful employment practice—and if that belief was objectively reasonable—the complaint was a protected activity. If the employee did not believe he was opposing an unlawful employment practice, or if that belief was not objectively reasonable, his complaint would *not* be a protected activity, and a claim of retaliation based on that complaint would fail as a matter of law. In Jordan, an African-American employee was in a room with several co-workers who were watching news coverage of the arrest of the suspected D.C. snipers. Immediately after the arrest of John Allen Muhammad and Lee Boyd Malvo was reported on the news, and one co-worker said out loud: "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f*** them." Jordan, 458 F.3d at 336. Jordan discussed the comment with other co-workers, who informed Jordan that the person who made the statement had made similar, racial comments before. Id. Jordan complained to his supervisor and, "[a] month later Jordan was fired, purportedly because he was 'disruptive,' his position 'had come to an end,' and management personnel 'don't like [him] and [he] don't like them.'" Id.

On appeal, the Fourth Circuit held that it was not objectively reasonable to believe that complaining about a single comment was protected because the single comment did not indicate the presence of a hostile work environment:

> On the question of whether Jordan was complaining of an actual hostile work environment made unlawful by Title VII, we conclude that he was not. While Farjah's comment on October 23, 2002 (or October 24) was unacceptably crude and racist, it was an isolated response directed at the snipers through the television set when Farjah heard the report that they had been arrested. Because the remark was rhetorical insofar as its object was beyond the workplace, it was not directed at any fellow employee. Moreover, it was a singular and isolated exclamation, having not been repeated to Jordan or in his presence before or after October 23, 2002. Jordan does not and cannot allege in his complaint that Farjah's comment altered the terms and conditions of his

- 13 -

employment. Based on all that Jordan knew, Jordan concluded that the remark reflected unacceptable racism and should not have been made. And while we agree with Jordan's sentiment, we conclude that such an allegation is a far cry from alleging an environment of crude and racist conditions so severe or pervasive that they altered the conditions of Jordan's employment with IBM or ARC. The complaint does not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm.

Id. at 339-40. The same is true here. As a matter of law, although Plaintiff may have been opposing conduct and mindsets she deemed narrow or offensive, opposing a single comment not directed to anyone in particular is not a protected activity. The record is wholly devoid of any other discriminatory acts about which Plaintiff may have been complaining. Surely this workplace was not in the grips of a hostile work environment so severe and pervasive as to alter the terms and conditions of Plaintiff's employment such that it was reasonable to believe that she was opposing a hostile work environment. See Coulson v. The Goodyear Tire & Rubber Co., 31 Fed. App'x 851, 858 (6th Cir. 2002). Absent that, summary judgment should be granted to the Defendants.

## V.    CONCLUSION

Plaintiff cannot carry her burden to establish that her employer regarded her as being substantially limited in one or more major life activity. In the absence of any such evidence, summary judgment should be granted to Defendants on Plaintiff's claim of discriminatory termination.

Likewise, it was not objectively reasonable to believe that Plaintiff's complaint about a single, isolated interaction with her co-workers constituted opposition to an unlawful employment practice. As such, she cannot prevail on her claim of retaliation, and summary judgment should be granted.

- 14 -

Finally, for the reasons stated in open court on August 19, 2011, I will grant the motion to quash the deposition of Rebecca Wells.

The clerk is directed to send a copy of the Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 29th day of August, 2011.

s/Jackson L. Kiser
Senior United States District Judge